**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**


HENRY L. WILKERSON,                    :

       Plaintiff,                    :
                             Case No. 3:08cv00419
 vs.                    :

                             District Judge Walter Herbert Rice
MICHAEL J. ASTRUE,                    :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,               :

       Defendant.                    :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Impaired mental functioning and emotional difficulties have twice led Plaintiff Henry Wilkerson to file applications for Supplemental Security Income (SSI). The Social Security Administration granted his first SSI application in October 1992 at the initial stage of administrative review based on "mental retardation" and "personality disorders." (Tr. 305). At that time, he was twenty-four years old.

Plaintiff continued to receive SSI until 2002 when he was incarcerated in state prison for kidnaping. (Tr. 17; *see* Tr. 148-49). After his release from prison on November 9, 2004 (Tr. 143), he filed a second SSI application on November 10, 2004 re-asserting that as of March 1, 1992, he was under a "disability" within the meaning of the Social Security Act and thus qualified to receive SSI.

The Social Security Administration denied Plaintiff's second SSI application at each stage of administrative review. The most significant stage for present purposes

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

involved two hearings before Administration Law Judge (ALJ) James I.K. Knapp.  (Tr. 327-87).  After the close of those hearings, ALJ Knapp issued a written decision concluding that Plaintiff did not suffer from a "disability" within the meaning of the Social Security Act.  ALJ Knapp thus denied Plaintiff's second SSI application.  (Tr. 17-27).  ALJ Knapp's non-disability decision is subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of ALJ Knapp's decision and a remand of this case to the Social Security Administration for payment of SSI.  Plaintiff alternatively seeks a remand of this case to the Social Security Administration to correct certain errors.  The Commissioner seeks an Order affirming ALJ Knapp's decision.

## II.    ADDITIONAL BACKGROUND

### A.    Plaintiff's Age, Education, and Work History

At the time of ALJ Knapp's decision, Plaintiff's age (thirty-nine years old) placed him in the category of a "younger person" for the purpose of resolving his SSI application.  *See* 20 C.F.R. §416.963(c); *see also* Tr. 25.  Plaintiff completed high school through a special education program.

During one of ALJ Knapp's hearings, Plaintiff testified that he had never held a full-time job longer than three months.  He explained, "Every job that I had, they said that I was doing the work too slow, so I was fired."  (Tr. 333).

### B.    Plaintiff's First SSI Application and Grant of SSI

The Social Security Administration's determination in 1992 that Plaintiff was under a disability was based mainly on the October 1992 report written by Reginald L Jones, Ph.D. The report noted that Plaintiff had worked only odd jobs, the longest lasting 1½ months. (Tr. 316). Dr. Jones also reported that Plaintiff scored as follows on intelligence testing: verbal IQ 70, performance IQ 75, and full-scale IQ 72. (Tr. 318).

Dr. Jones administered the Wechsler Memory Scale and reported, "Test results suggest that the claimant's memory functions are in the mildly mentally retarded range; however, his performance may have been affected by fatigue or a lack of motivation towards the end of ... of this instrument.... [I]n spite of motivational factors, it is this examiner's opinion that his memory functions remain subnormal probably in the borderline to upper mild mental retardation range." (Tr. 318).

Dr. Jones also administered reading tests, the results of which suggested that Plaintiff was reading at a grade equivalent below 3.8. (Tr. 319). Dr. Jones explained, "Test results suggest that the claimant is functionally illiterate. Reading rate was extremely slow as well. It is this examiner's opinion that the results are valid. Thus, he's likely to have major difficulty reading and comprehending simple information." (Tr, 319).

Dr. Jones diagnosed Plaintiff with borderline intellectual functioning and avoidant personality disorder. (Tr. 319). Dr. Jones concluded, in part, "There are cognitive deficits in attention, concentration, short-term recall, long-term recall, abstracting abilities, insight and judgment. Persistence is likely to be impaired as well. However, pace seems adequate. Reading comprehension is quite poor as well." (Tr. 319).

In late October 1992, psychologist Robert E. Bartha, Ph.D. reviewed the file including Dr. Jones's report. (Tr. 296-305). Dr. Barth concluded that Plaintiff met the regulatory criteria for mental retardation set forth in Listing 12.0C. (Tr. 296-97). Dr. Barth checked boxes on a form indicating his opinion that Plaintiff's IQ fell within the Listing range and met the Listing requirement of "[s]ignificantly subaverage general

intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22) or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period...." (Tr. 300). And Dr. Bartha elsewhere noted that Plaintiff met the criteria under Listing 12.08 for avoidant personality disorder. (Tr. 301).

Based on Dr. Jones's findings and opinions – as accepted by Dr. Bartha – the Social Security Administration granted Plaintiff's first SSI application, finding him to be under a disability, beginning on March 1, 1992, due to "Mental Retardation" and "Personality Disorders." (Tr. 305).

### C.     Evidence Connected to Plaintiff's Second SSI Application

In September 2003, while Plaintiff was incarcerated in the Madison Correctional Institution, he underwent a mental health evaluation with psychologist Edward Okel, Ph.D. Dr. Okel diagnosed Plaintiff with cocaine dependence, in institutional remission; R/O (rule out) schizophrenia, disorganized type; and mild mental retardation. (Tr. 149). Dr. Okel did not administer any psychological tests but noted that a GAMA (General Ability Measure for Adults, *see* Doc. #8 at 4) "administered 11/01 yields an IQ of 65, suggesting mild mental retardation." (Tr. 148).

Dr. Okel described Plaintiff's thought process as "rambling and very tangential and there is some loosening of associations." Dr. Okel also noted, "There is no evidence of delusions, hallucinations or preoccupations. On questioning, inmate's description of 'voices' appears related to his own thoughts. He denies command hallucinations." (Tr. 148).

Plaintiff's progress notes concerning his health care in 2004, while he was in prison, show that he was being treated with counseling and a prescription medication (Geodon). (Tr. 144-47).

After his release from incarceration, Plaintiff was seen at Samaritan Behavioral Health and DayMont Behavioral Health due to mental health difficulties. (Tr. 175-200,

206-41, 242-75). Ellen Mills, Psy.D. diagnosed Plaintiff in May 2005 with depressive disorder, recurrent and moderate with psychotic features; intermittent explosive disorder; and borderline intellectual functioning. (Tr. 231-32). Dr. Mills noted that Plaintiff's current medication included Geodon, an antipsychotic medication, and Trazadone, a sleep aid. (Tr. 225).

In connection with his second SSI application, Jerry E. Flexman, Ph.D. evaluated Plaintiff in January 2005. Dr. Flexman administered intelligence testing with the following results: verbal IQ 69, performance IQ 75, and full-scale IQ 69. (Tr. 155). He diagnosed Plaintiff with borderline intellectual functioning but did not diagnose Plaintiff with a personality or other mental disorder. (Tr. 153).

Dr. Flexman believed that Plaintiff was slightly impaired in his ability to understand, remember, and carry out simple instruction. He also concluded that Plaintiff had a slight impairment to his "inability [sic] to make judgments for simple work-related decisions" and a slight impairment in his ability to sustain attention and to respond appropriately to work pressures in their normal settings. (Tr. 153). According to Dr. Flexman, Plaintiff's "restrictions for interacting appropriately with the public are moderate." (Tr. 153).

In February 2005 psychologist Williams Benninger, Ph.D. reviewed the record and completed a form by checking boxes indicating that Plaintiff had "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22, with ... [a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." (Tr. 165). Dr. Benninger identified this medically determinable impairment as "BIF" presumably meaning, borderline intellectual functioning. *Id*.

Dr. Benninger completed another form by checking boxes indicating that Plaintiff was not significantly limited in most work areas. (Tr. 158-59). Dr. Benninger explained

in part "Clmts ability to relate to supervisors and coworkers in mild. Clmts ability to related to the public is moderate. Clmt has a girlfriend and lives with his mother and brother. He reports getting along well with others and socializes with family and friends. He says he has a good mood and his temper is controlled...." (Tr. 159).

In June 2006 Plaintiff was seen at the Bureau of Vocational Rehabilitation for possible services. (Tr. 111-12). He was referred to "Capabilities for a CBA" (Community Based Assessment). (Tr. 112; *see* Doc. #8 at 5). At Capabilities, Plaintiff worked with a job coach and was placed with Precision Manufacturing for a three-week evaluation. Plaintiff worked with a Job Coach each day at Precision Manufacturing. (Tr. 114-21). The Job Coach reported that Plaintiff had many strengths including, for example, "Henry learns tasks in a short period of time, stays organized, and inspects items to be sure [they are] correctly assembled." (Tr. 121). The Job Coach noted two weaknesses: "1. Henry has no interaction with other employees. 2. Henry arrives late to the job site." *Id.* The Job Coach (JC) recommended the following:

> This JC recommends Job Development based on a CBA ... to provide thorough and appropriate job searches. JC recommends job goal in production/assembly/factory. [Plaintiff] learned duties in a short period of time, followed instructions, reported all defects on parts and made rate set by [Precision Manufacturing]. JC will recommend job coaching to assist [Plaintiff] to learn new job duties, obtain required speed, and arrive on time at job site. On CBA, [Plaintiff] was late eleven minutes his last day of CBA. Lastly, JC will recommend follow along to ensure Henry complies with all job duties, interacts with management and coworkers, and gains successful employment.

(Tr. 121)(emphasis in original).

During ALJ Knapp's hearings, Mary Eileen Buban, Psy.D., testified as a medical expert. Based on her review of what appeared to be the current record, *see* Tr. 348, and hearing Plaintiff's testimony during the first hearing, Dr. Buban disagreed with the diagnosis of mild mental retardation based on the results of the GAMA test. (Tr. 347-48). Upon further consideration of the prior administrative record, Dr. Buban explained,

"based on my review of this record, Dr. Reginald [Jones] has diagnosed ... borderline intellectual functioning, avoidant personality disorder, and a 60 GAF."[2]  (Tr. 349).  She later opined:

> I think in the context of the whole record, I do agree with borderline intellectual functioning.  And, I guess, based on this earlier evaluation, I think the psychotic disorder is to be taken more seriously.  There's more pre-existing evidence for it.  The only caveat to that was that he was drinking 40 ounces three times a week, with some occasional wine.  But he told them he never used drugs.  So giving, reviewing these records from the previous file, I can understand why, well, I never really understand why the man was placed on disability, but I do see that the current record also supports the findings that are in the previous record with the exception of the fact that rather than a personality disorder, I would be more inclined to agree with the psychotic disorder NOS.

(Tr. 349-50).  Dr. Buban acknowledged, "if we just look at the numbers...," meaning Plaintiff's IQ scores, then he meets the range in Listing 12.05C because "[h]e's got 69 in his IQs."  (Tr. 354).  Dr. Buban further testified, "A 70 IQ is in the borderline range according to WISC.  So, when I say borderline, 70 to me is borderline intellectual functioning.  He is right on the cusp.  He's got some higher....  He's got some lower.  So, borderline is where he's functioning."  (Tr. 354).

When asked by Plaintiff's counsel if there was also evidence of deficits in adaptive functioning, Dr. Buban testified, "And that's where the dilemma is, I think, for insufficient information."  (Tr. 355).  Dr. Buban noted that the results of Plaintiff's experiences with Goodwill and BVR would provide information about his adaptive

---

[2]  "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.  A GAF of 60 refers to a person with "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning..."

functioning in the work domains.  (Tr. 356).  The ALJ consequently postponed the first hearing to provide time for Plaintiff to submit the records related to BVR.

At the second administrative hearing, Dr. Buban testified:

> Well what the new record indicates is that he did have a successful BVR work experience.  And the way the record reads they were going to place him in a job.  They were going to because he did successful [sic] do that wiring and harness work.  There were no[ ] complaints. They were going to place him in a job....

(Tr. 372).  Dr. Buban the discussed the contents of the BVR records, concluding in part, "It sounds like he pretty well just kind of went there, just did his job, took his breaks, and then went home...."  (Tr. 373).

Dr. Buban further testified that she did not see any areas of deficits in adaptive functioning besides academic skills.  (Tr. 374).  And she testified, "based on the most recent information, plus his successful work attempt, borderline intellectual functioning seems more in line with his true functioning."  *Id*.

Dr. Buban acknowledged that Plaintiff had been diagnosed with a depressive condition and had a relapse in drug issues after his release from prison.  She further acknowledged that he completed drug treatment and she saw nothing in the record to indicate another relapse.  (Tr. 375).

Regarding work restriction, Dr. Buban relied on the BVR report and testified that Plaintiff seemed to do best working alone and he would be limited in his ability to perform jobs with high production quotas, although he had an adequate pace.  (Tr. 377). He would also not be limited from jobs involving public contact but could have casual contact with coworkers.  He could not follow complex or detailed or written instructions, according to Dr. Buban.  (Tr. 377-78).  Dr. Buban agreed that a person's IQ reflects a life-long level of functioning.  (Tr. 380).

## III.    THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements. Chief among these is the "disability" requirement. To receive SSI an applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986).

The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 20-21; *see also* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

## IV.    ALJ KNAPP'S DECISION

ALJ Knapp determined at Step 1 of the sequential analysis that Plaintiff had not been engaged in any substantial gainful activities at any time since his alleged onset date of March 1, 1992.  (Tr. 26).

At Step 2 the ALJ determined that Plaintiff suffered from the severe impairments of borderline intellectual functioning, probable avoidant personality disorder, and depressive disorder NOS (not otherwise specified).  *Id.*

ALJ Knapp determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity of an impairment in the Listings.  *Id.*

At Step 4 the ALJ found that the Plaintiff has no past relevant work and that he retained the Residual Functional Capacity "to engage in exertional, postural, manipulative, visual, communicative, and environmental activities within normal limits, as he has no severe physical impairments."  *Id.*  The ALJ further concluded:

> From a mental standpoint, he is able to perform unskilled work, subject to the following restrictions: (1) no complex, detailed, or written instructions; (2) no jobs involving reading or writing skills above the third-grade level or math skills above fourth[-]grade level; (3) no contact with the public; (4) no more than occasional contact with co-workers (a restriction which includes no work as part of a team with others on work projects); and (5) only low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average work pressure for production, work that is other than routine in nature, or work that is hazardous).

*Id.*

The ALJ found at Step 5 that Plaintiff could perform a significant number of jobs existing in the regional and national economies.

Based on his findings throughout the sequential evaluation, the ALJ ultimately concluded that Plaintiff was not under a "disability" within the meaning of the Social Security Act and was therefore not eligible to receive SSI.

## V.    JUDICIAL REVIEW

Judicial review of an ALJ's decision focuses in part on whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The Court's agreement or disagreement with the ALJ's findings plays no role in the substantial evidence review, and no significance attaches to contrary evidence in the record – if other substantial evidence supports the ALJ's findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Reviewing for substantial supporting evidence is not the stopping point of judicial analysis. Courts also examine the administrative decision to determine whether the ALJ applied the correct legal criteria. *See Bowen*, 478 F.3d at 746. If the ALJ did not, the decision may not be upheld even when substantial evidence supports the ALJ's findings. *See id.* For example, a decision will not be upheld where the ALJ failed to apply the standards mandated by the Social Security Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See*

*Bowen*, 478 F.3d at 746 (and cases cited therein).  Through *Bowen* and other recent Sixth Circuit cases, an ALJ's failure to apply the correct legal criteria – at least when evaluating medical source opinions – mandates further judicial review for harmless error.  *Bass II v. McMahon*, 499 F.3d 506, 512 (6th Cir. 2007); *see Bowen*, 478 F.3d at 747-49; *see also Wilson*, 378 F.3d at 547-49 (offering examples of possible *de minimis* errors).  Consequently, if the ALJ erred by not applying the correct legal criteria but the error was harmless, the decision should be affirmed.  *See Bass II*, 499 F.3d at 512 (and cases cited therein).

## VI.    DISCUSSION

### A.    Plaintiff's First Claimed Error

#### 1.

Plaintiff contends that the ALJ erred, under *Drummond v. Comm'r. of Soc. Sec.*, 126 F.3d 837 (6th Cir 1997), by failing to accept the Social Security Administration's 1992 conclusion that he met Listing 12.05C for mental retardation because the ALJ concluded there was not medical improvement.

The Commissioner maintains that the ALJ thoroughly discussed *Drummond* and reasonably declined to bound by the 1992 disability determination based on the new and material evidence in the administrative record, including all the updated medical evidence, the BVR report, and Dr. Buban's testimony.

Resolution of the parties' contentions requires an explanation of *Drummond* and a description of the ALJ's reasoning regarding *Drummond*.

#### 2.

The United States Court of Appeals for the Sixth Circuit held in *Drummond*, "the principles of res judicata can be applied against the Commissioner.  When the Commissioner has made a final decision concerning a claimant's entitlement to benefits,

the Commissioner is bound by this determination absent changed circumstances." *Id*. at 842 (citations omitted).

"Absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id*. Under *Drummond*, "The burden is on the Commissioner to prove changed circumstances and therefore escape the principles of res judicata." *Id*. at 843.

Applying res judicata in *Drummond*, the Court of Appeals held that the Commissioner was bound to the prior conclusion that claimant had the Residual Functional Capacity to perform sedentary work because the Commissioner did not produce substantial evidence showing that claimant's condition had improved significantly. *Id*. Thus, given the claimant's age and limitation to sedentary work, the Court of Appeals found her eligible for benefits. *Id*.

After *Drummond*, the Commissioner issued an Acquiescence Ruling mandating ALJs in Ohio (and other states within the Sixth Circuit) to follow *Drummond* by applying res judicata to a prior assessment of a claimant's residual functional capacity and other prior findings made as part of a sequential evaluation. The Acquiescence Ruling explained:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law....

AR 98-4(6), 1998 WL 283902 at *3 (June 1, 1998).

ALJ Knapp discussed *Drummond* and relied on AR 98-4(6) as follows:

> I recognize that claimant was previously found to be disabled pursuant to Listing 12.05C in 1992. In <u>Drummond v. Commissioner</u>, 126 F.3d 837 (6th Cir 1997), the Sixth Circuit held that a prior ALJ's decision was res judicata with respect to a claimant's residual functional capacity, at least in the

absence of new evidence. This principle would logically extend to BDD [Ohio Bureau of Disability Determinations] determinations and to step 2 findings. While a literal reading of the court's opinion suggests that there may be a need to show actual medical improvement since the date of the earlier decision or determination before changing a claimant's residual functional capacity, the Administration has taken the position (consistent with its internal interpretation of res judicata in Hallex I-2-440) that only new and material evidence with respect to a claimant's functional abilities and medical condition is needed in order for a subsequent adjudicator to find a new residual functional capacity (AR-98-4/61).

(Tr. 21).

### 3.

The ALJ erred as a matter of law to the extent he concluded that the Commissioner does not need to show improvement in Plaintiff's condition to avoid the res judicata effect of the prior determination that he met Listing 12.05C because *Drummond* requires such evidence. "Absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."[3] *Drummond*, 126 F.3d at 842.

To avoid the improvement-requirement of *Drummond*, the ALJ cited Acquiescence Ruling 98-4(6) as not requiring evidence of improvement but as merely requiring "only new and material evidence with respect to a claimant's functional abilities and medical condition..." (Tr. 21). This reading of AR 98-4(6) is inconsistent with *Drummond* because, as just quoted, *Drummond* mandates the Commissioner to produce evidence of "improvement in a claimant's condition" in order to avoid administrative res judicata. 126 F.3d at 842. AR 98-4(6) does not aid the Commissioner in overcoming the ALJ's error because ALJs in this District must follow *Drummond* and may not avoid doing so based on a narrow reading of AR 98-4(6). The Commissioner's Acquiescence

---

[3] Although the previous administrative decision in this case was not made by an ALJ, it was an "initial determination" that Plaintiff met Listing 12.05. (Tr. 305). "An initial determination is subject to the doctrine of administrative res judicata." *Drummond*, 126 F.3d at 841 (citing *Draper v. Sullivan*, 899 F.2d 1127, 1130 (6th Cir. 1990)).

Rulings – like the Commissioner's Regulations – "are not the supreme law of the land. "It is, emphatically, the province and duty of the judicial department, to say what the law is," *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), and the [Commissioner] will ignore that principle at [her] peril.'" *Hutchinson for Hutchinson v. Chater*, 99 F.3d 286, 287-88 (8th Cir. 1996)(other citations omitted)(brackets in *Hutchinson*). It is, moreover, questionable whether AR 98-4(6) strictly applies *Drummond* since AR 98-4(6) does not use the phrase "improvement in a claimant's condition" when instructing ALJs how to apply *Drummond*. It instead permits ALJs to use "new and material evidence relating to such a [prior] finding..." to avoid administrative res judicata without considering whether such evidence also shows improvement in a claimant's condition. This left the ALJ free to interpret AR 98-4(6) as not requiring the Commissioner to produce new and material evidence that Plaintiff's condition improved to the point he no longer satisfied Listing 12.054C. This constituted error.

To hold otherwise would permit ALJs and the Commissioner to ignore *Drummond* and dispense with the doctrine of administrative res judicata by, for example, relying on the testimony of a new medical expert, who merely disagreed with the prior disability determination without considering any new evidence. Such an approach would conflict with *Drummond* and would thus constitute error.

Despite this misstep in the ALJ's decision, the Commissioner contends that the ALJ properly applied *Drummon*d by finding, "There is clearly new and material evidence that shows that the claimant is not in fact retarded and that there has been medical improvement in the condition found to exist back in 1992." (Tr. 21). In this manner, the ALJ considered whether the record contains new and material evidence of medical improvement, despite his prior avowal that such evidence was unnecessary under AR 98-4(6). The ALJ then noted, "The new evidence includes the various reports in the updated record and the testimony of the Medical Expert who had the opportunity to review the entire record." (Tr. 21). In this manner, the ALJ adequately identified new and material

evidence of improvement sufficient to overcome the res judicata effect of the prior determination that Plaintiff met Listing 12.05C.

Plaintiff argues that the Commissioner has failed to show such improvement because mental retardation is, by definition, a condition that does not improve over time. This contention lacks merit, even though Dr. Buban's testimony confirms that a person's IQ reflects a lifelong level of functioning. Plaintiff overlooks that the ALJ was not bound by the prior Listing 12.05C determination of mental retardation because there was new and material evidence of improvement such that he no longer met the criteria under Listing 12.05C. Such criteria includes more than IQ test scores; it includes "a physical or other mental impairment imposing an additional and significant work-related limitation of function...." *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)(quoting Listing 12.05C). Consequently, if new and material evidence showed improvement in the condition that imposed an additional and significant work-related limitation, then administrative res judicata does not apply under the standard mandated by *Drummond*.

Such is the situation here because the record contains new and material evidence in the form of Dr. Flexman's opinion, who concluded that Plaintiff was only mildly or moderately impaired in each area of work ability, *see* Tr. 153, and the testimony of Dr. Buban, who relied in part on post-1992 evidence to form her opinion that Plaintiff did not meet Listing 12.05C.

In sum, although the ALJ erred to the extent he incorrectly described the legal criteria applicable in *Drummond*, the ALJ applied the correct legal criteria and did not err by concluding that the record contains new and material evidence of improvement in Plaintiff's condition. Plaintiff's first claimed error therefore lacks merit.


### B.    Plaintiff's Second Claimed Error

Plaintiff alternatively contends that even if *Drummond* was not directly applicable, he meets or equals Listing 12.05C.

The first sentence of Listing 12.05 provides:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Subpart P, Appendix, §12.05.  Listing 12.05C contains the following two criteria:

1.      A valid verbal, performance, or full scale IQ of 60 through 70; and

2.      A physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Subpart P, Appendix, §12.05(C).

The Commissioner acknowledges, "Plaintiff had a requisite IQ score." (Doc. #10 at 8).  The Commissioner contends that despite this, Plaintiff "has not demonstrated that he was mentally retarded." (Doc. #10 at 8).  The Commissioner reasons that Plaintiff has never been diagnosed with mental retardation and has instead been merely diagnosed with borderline intellectual functioning, both in 1992 and more recently by Drs. Flexman and Buban.  The Commissioner's remaining assertions seek to show that Plaintiff has few limitations in his work abilities and that he has failed to establish any deficits in adaptive functioning.

Both the Commissioner and the ALJ are incorrect in their assertion that Plaintiff must produce a diagnosis of mental retardation in order to meet the criteria of Listing 12.05.  Indeed, the Commissioner is usually quick to point out that a mere diagnosis does not establish that a claimant is under a "disability." *See, e.g., Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986); *see also* 20 C.F.R. §416.927(e)(1); *cf. Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").  Requiring such a diagnosis in cases of mental retardation would place formalism over substantive evidence.

Thus, instead of requiring a diagnosis of mental retardation, the correct analysis focuses on whether the evidence of record meets or equals Listing 12.05C's criteria.

The record contains evidence showing that Plaintiff has deficits in functional academic skills as documented by test results showing he was reading at below grades 3.8 (Tr. 319) or grade 5 (Tr. 156). In addition, Dr. Buban acknowledged that Plaintiff has deficits in academic skills, such as reading comprehension and math. (Tr. 373-74). Plaintiff has additional deficits. As noted in the BVR records, Plaintiff qualified for vocational services because he was found to be "seriously" limited in communication, interpersonal skills, and self-direction. (Tr. 113). The ALJ overlooked or ignored this aspect of the record and thus failed to consider all the evidence. *See Hurst v. Secretary of Health & Hum. Svcs.*, 753 F.2d 517, 519 (6th Cir. 1985). The ALJ, moreover, determined that Plaintiff had "moderate limitations" in his social functioning. (Tr. 22).

The ALJ seemed unduly swayed by Plaintiff's performance during vocational training at Precision Manufacturing. *See* Tr. 21. The ALJ failed to consider that Plaintiff was able to complete such work with the presence of a full-time work coach. The job tasks Plaintiff performed also capitalized on what Dr. Buban described as Plaintiff's strengths in visual analysis and inspection. His job coach, moreover, recognized that Plaitniff would still need job coaching to help him learn new job duties, achieve the required rate of task completion, and to "follow along" to ensure he "complies with all job duties, interacts with management and coworkers, and gains successful employment." (Tr. 121).

The Commissioner contends that Plaintiff lacks deficits in adaptive functioning because he is able to perform household chores, use public transportation, and do odd jobs. (Doc. #10 at 10-11). Yet such activities are not inconsistent with mild mental retardation. The Sixth Circuit Court of Appeals has recognized that a claimant's ability to use public transportation, to obtain a driver's license, visit friends, make change at a grocery store, do his own laundry and clean his room, work as a truck driver recording

mileage and other details, were not inconsistent with a valid IQ test of 69. *Brown v. Secretary of Health & Hum. Svcs.*, 948 F.2d 268, 269 (6th Cir. 1991).

The record, moreover, contains numerous records concerning mental health treatment Plaintiff has undergone since he was released from prison. (Tr. 175-200, 206-41, 242-75). Ellen Mills, Psy.D. diagnosed Plaintiff in May 2005 with depressive disorder, recurrent and moderate with psychotic features; intermittent explosive disorder; and borderline intellectual functioning. (Tr. 231-32). Dr. Mills noted that Plaintiff's current medication included Geodon, an antipsychotic medication, and Trazadone, a sleep aid. (Tr. 225). The ALJ did not mention this evidence at Step 3 of his analysis, *see* Tr. 22-23, and it is not otherwise apparent from his decision that he considered this evidence when concluding that Plaintiff did not meet or equal the criterial of Listing 12.05C. It was error for the ALJ to overlook or ignore such evidence at Step 3. *Cf. Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *cf. also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

Accordingly, Plaintiff's second claimed error is well taken, and the ALJ's decision at Step 3 of the sequential evaluation is not supported by substantial evidence.

###     C.     Remand Is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above. On remand, the ALJ should be directed to review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for SSI.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Henry Wilkerson was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

October 13, 2009                                         s/Sharon L. Ovington
                                                        Sharon L. Ovington
                                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).